UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

*In re*:

GARY C. SUKOWATEY and　　　　　　　Case No. 25-11435-13
NANCY A. SUKOWATEY,

Debtors.

## DECISION ON TOWN OF WARREN'S
## MOTION FOR DETERMINATION OF INAPPLICABILITY OF
## AUTOMATIC STAY OR, IN THE ALTERNATIVE, FOR RELIEF FROM
## AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)
## WITH RESPECT TO THE COMMERCIAL PROPERTY

The Debtors, Gary C. Sukowatey and Nancy A. Sukowatey (the "Debtors"),

filed a voluntary Chapter 13 bankruptcy petition on June 20, 2025. The Town

of Warren, St. Croix County, Wisconsin (the "Town"), filed a *Motion for

Determination of Inapplicability of Automatic Stay or, in the Alternative, for Relief

from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* (the "Motion"). The

Debtors object to the Motion. The Motion was submitted on briefs.

### STATEMENT OF FACTS

The Debtors own two parcels of adjacent real estate: (i) 903 120th Street,

Roberts, Wisconsin 54023 (the "Residential Property"), and (ii) 905 120th Street,

Roberts, Wisconsin 54023 (the "Commercial Property").[1] The parties say the

material facts are largely uncontested.

---

[1] At times the Town simply combines references to these two properties as "Sukowatey
Property." As a result, the arguments presented are, at times, less than clear.

The Debtors did not object to relief from stay for the Residential Property.

Debtors and the Town agreed that razing that property was beneficial. The

Court granted relief from stay for the Residential Property (Dkt. No. 47).

So this decision is limited to the Motion as it relates to the Commercial

Property. Thus, the only issue to be resolved by the Court is the application of

11 U.S.C. § 362(a) to the Commercial Property. And the material facts focus on

the Commercial Property.

On June 8, 2022, the Town asked to inspect both properties, noting

some visible issues and unspecified reports from neighbors or others about

concerns related to the properties. In October 2022, the Commercial Property

was inspected. The inspector listed several building code issues:

| | |
|---|---|
| No smoke or carbon monoxide detectors | Bathroom outlets not GFCI protected |
| No cover on the bath fan | Toilet is not in proper working condition |
| Missing multiple electrical cover plates | Mold and water damage in the bathroom |
| Multiple bedrooms do not have windows | Water stains on the ceiling |
| Other bedroom windows that do not open | Door to the upstairs is boarded shut |
| Kitchen outlets not in working condition | Open electrical wire splices |
| Sliding door is not in proper working order | Plumbing pipes are not supported properly |
| Light fixtures are not securely fastened or missing covers | Plumbing pipe exits the building above grade not to a POWTS system |
| Electrical outlets are exposed outside of the building | Paint cans and chemicals stored in a backroom |
| Exposed electrical wire in the building | Plumbing pipe discharges to the outside |
| Roof has been patched several times | Missing siding on the exterior of building |

In January 2023, the Town notified the Debtors of noncompliance with the

Town Code. The notice gave 30 days to resolve the violations.

About ten months later, the Town's inspector served the Debtors with the

Raze Order. There is no evidence of any follow-up inspections before the Raze

Order was issued. The record contains no detail of what issues, if any, remained unaddressed in the ten months since the inspection.

Three months later, the inspector placed a placard on the Commercial Property indicating it was unfit for human habitation. Again, there is no evidence of any follow-up inspection or what items remained to be repaired. Two months later, the inspector found the tenants were still at the Commercial Property.

On March 15, 2024, the Town filed a complaint seeking an enforcement order to raze the building and structures and remove the tenants due to the condition of the property. The Debtors responded and counterclaimed.

The Debtors say that many issues had been addressed. Some were routine maintenance issues. Others would have been addressed but for either (1) a stop work order and the refusal of the Town to issue a building permit or (2) the weather.

The Town's motion to dismiss the counterclaims was granted by the Circuit Court. The Town then moved for summary judgment, which was granted in the St. Croix County Court on January 14, 2025.

The Debtors filed a Notice of Appeal in January. The Appeals Court stayed the proceedings until June 23, 2025. Demolition of the Commercial Property was scheduled for that day. The Debtors filed their bankruptcy on June 20, 2025.

## DISCUSSION

A.  Jurisdiction

This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and (b).

Since the matter deals with whether the action is excepted from the automatic

stay or, in the alternative, whether relief from stay is appropriate, it is a core

proceeding under section 157(b)(2). The Court may enter final judgment.[2]

B.  11 U.S.C. § 362(b)(4)

The filing of a bankruptcy petition imposes a stay of actions to recover a

claim against the debtor. It also stays actions to enforce prepetition judgments

against the debtor or property of the estate, to obtain possession of property of

the estate, or to gain control over that property. 11 U.S.C. § 362(a). The

automatic stay is not without exceptions. It does not apply to certain specified

actions by a governmental unit. The exception for such actions is set forth in

11 U.S.C. § 362(b)(4). The statute provides:

> (b) The filing of a petition under section 301, 302, or 303 of this title
> [...] does not operate as a stay—
>
> (4) [...] of the commencement or continuation of an action or
> proceeding by a governmental unit [...] to enforce such
> governmental unit's [...] police and regulatory power, including
> the enforcement of a judgment other than a money judgment,
> obtained in an action or proceeding by the governmental unit to
> enforce such governmental unit's [...] police or regulatory
> power[.]"[3]

---

[2] *See* 28 U.S.C. § 157(b)(1).

[3] 11 U.S.C. § 362(b)(4).

In short, the exception applies when the action is: (i) by a governmental unit and (ii) to enforce police and regulatory powers and not to collect property or money from the estate.[4]

It is undisputed that the first prong of section 362(b)(4) is satisfied. Section 101(27) states that the term "governmental unit" means a "[...] State; Commonwealth; District; Territory; municipality; foreign state; [...] or other foreign or domestic government."[5] Section 101(40) clarifies the term "municipality" to mean a "political subdivision or public agency or instrumentality of a State."[6]

Thus, the inquiry now is whether the second prong of section 362(b)(4) is met. Is the Town's order to raze the Commercial Property an enforcement of its police and regulatory powers, or is it a collection of property or money from the estate?

The parameters of a governmental unit's police and regulatory powers are set forth in *McMullen v. Sevigny*.[7] Police and regulatory powers are narrow. They relate to health, welfare, morals, and safety.[8] The powers include enjoining or deterring ongoing debtor conduct which would seriously threaten

---

[4] *See* Robert E. Ginsberg, et al., *Ginsberg & Martin on Bankruptcy* § 3.02 (6th ed., 2025-1 Supp. 2021-2022).

[5] 11 U.S.C. § 101(27).

[6] 11 U.S.C. § 101(40).

[7] *See McMullen v. Sevigny* (*In re McMullen*), 386 F.3d 320 (1st Cir. 2004).

[8] *See* Robert E. Ginsberg, et al., *Ginsberg & Martin on Bankruptcy* § 3.02., n.267.

public safety and welfare.[9] And so, a raze order arising from circumstances that pose a *serious* risk to public health and safety would fall within such powers.

Because a government action could merely be *characterized* as protecting public health and safety, this Court must review the circumstances before determining whether the section 362(b)(4) exception applies.[10] When assessing if a particular governmental proceeding falls under the exception, courts use two interrelated fact-dominated inquiries known as the "public policy" and "pecuniary purpose" tests.

The public policy test examines whether the government is effectuating public policy rather than adjudicating private rights.[11] The public policy here is whether a serious threat to public safety and welfare persisted. A related consideration is whether action or a refusal to act by the Town prevented correction of such threats.

Actions taken for the purpose of advancing private rights are not excepted from the stay. The Tenth Circuit and other Circuits that have addressed the police and regulatory power exception say satisfaction of the

---

[9] *See McMullen,* 386 F. 3d 320, 325.

[10] *See In re Iezzi*, 504 B.R. 777, 791 (Bankr. E.D. Pa. 2014).

[11] *See In re Lubin*, No. 8:23-bk-03168-RCT, 2023 Bankr. LEXIS 2236, at *7 (Bankr. M.D. Fla. Aug. 18, 2023).

public policy test makes it unnecessary to determine whether a governmental action satisfies the pecuniary purpose test.[12]

The pecuniary purpose test considers whether the government chiefly seeks to protect a pecuniary governmental interest in the debtor's property rather than protecting public safety and health. If it is clear the governmental action is chiefly to protect a monetary interest, then the action is not excepted from the stay under this test.[13]

After considering the totality of the circumstances, the Court asks whether the specific proceedings are *designed* to protect public safety and welfare *or* represent a governmental attempt to recover from property of the estate, whether on its own claim or on the non-governmental debts of private parties.[14] Proceedings that effectuate public policy are excepted from the automatic stay.[15]

C.    The Purpose of the Raze Order Falls Outside the Scope of 362(b)(4).

1.    *Public Policy Test*

The public policy test considers whether the government is effectuating public policy rather than adjudicating private rights.[16] Section 66.0413(b) of

---

[12]  *See Markham v. Auto Cycle Exch. Servs. (In re Markham),* No. CO-24-19, 2025 Bankr. LEXIS 1957, at *20-21 (B.A.P. 10th Cir. Aug. 15, 2025).

[13]  *See id.,* at *16.

[14]  *See McMullen,* 386 F. 3d at 325.

[15]  *See In re Hicks,* 582 B.R. 6 (Bankr. N.D. Ill. 2018).

[16]  *See In re Lubin,* 2023 Bankr. LEXIS 2236, at *7.

the Wisconsin Statutes provides that a designated officer of a municipality

may:

> if a building is old, dilapidated, or out of repair and consequently
> dangerous, unsafe, unsanitary, or otherwise unfit for human
> habitation and unreasonable to repair, order the owner of the
> building to raze the building or, if the building can be made safe by
> reasonable repairs, order the owner to either make the building safe
> and sanitary or to raze the building, at the owner's option.[17]

The Town argues its action relates to public health and safety under Section

66.0413(b) and thereby is a valid function of police and regulatory powers.[18] It

concerns conditions that make a building "otherwise unfit for human

habitation," which plainly relate to public health and safety.

Examples of what is unsafe, dangerous or uninhabitable are not stated

in the statute. But given the language of the statute, it indicates that a

building's condition must be dangerous, unsafe, unsanitary, or otherwise unfit

for humans to use as a dwelling (habitat). The statute also contains another

consideration for there to be a raze order. It must be "unreasonable to repair"

with reasonable repairs.

Some guidance is available. For example, in *Lerch v. City of Green Bay*,[19]

there was an initial inspection as well as a later inspection. The property had

rodent holes from various vermin, there was a feral cat inside the building,

---

[17] Wis. Stat. § 66.0413(b)(1) (2025).

[18] No copies of any Town Building Codes have been provided to the Court. As a result, and for the purpose of this decision, the Court will presume it is intended, as are most building codes, to relate to public health and safety.

[19] *Lerch v. City of Green Bay*, 2011 WI App 136, 337 Wis. 2d 428, 805 N.W.2d 735.

walls and floors were failing or damaged, and there were ceilings caved in.[20] No repairs had been made. The cost to repair the issues would have exceeded fifty percent of the value of the property.

The violations in this case can be grouped into a few types. First, needed electrical repairs that included missing covers on various outlets or fans, missing carbon monoxide detectors, a missing GFCI outlet in a bathroom, an inoperative switch in the kitchen, fastening a light fixture or replacing a missing cover, and wiring that was exposed. Second, drywall needed repairs for water stains, damage and mold inside. Third, window or door repairs and replacement included some windows that were missing or didn't open, a sliding door that didn't open properly, and a door that was boarded shut. Fourth, plumbing issues such as plumbing pipes not supported properly, a plumbing pipe that exited the building above grade and not to a POWTS system, a toilet that didn't work properly, and a pipe that discharged directly outside. Finally, exterior items that included some missing siding and a roof that had been patched on more than one occasion.

The Town says in its filings the Debtors were advised of "potential concerns and building code violations" when the inspector sought to inspect the property.[21] In January 2023, the letter listing violations was sent. *Id.* But

---

[20] Id. at ¶ 3.

[21] Town's Reply Brief, Dkt. No. 26, p. 2.

no follow-up inspections happened in the next ten or more months. Instead, the Town simply issued a Raze Order.

The record explains that various repairs were made during that time. Other repairs were in process. Missing electrical cover plates, for example, had been temporarily removed to paint.[22] Exposed wiring, GFCI protection in the bathroom were addressed, and repair of kitchen outlets was performed by an electrician. Confirmation of electrician repairs was sent to the building inspector.[23] That contractor would have continued performing the remaining repairs but for the stop work order.[24] Another contractor inspected the property finding (1) there was no standing water so the vent pipes were functioning, and (2) the pipe to the holding tank would need inspection and possible replacement once the frost was out of the ground.[25] He was preparing an estimate for the work but would need a permit from the Town.[26] A third contractor inspected the Commercial Property, found it structurally sound without apparent sanitation problems, and received a deposit for estimated repairs.[27] He requested a permit to do the work but says he was told by the

---

[22] Aff. of Gary Sukowatey, Dkt. No. 39-3, ¶ 3.

[23] Aff. of Scott Bjork, Dkt. No. 39-4, ¶¶ 5 and 9.

[24] *Id.* at ¶ 11.

[25] Nechville letter, Dkt. No. 39-14, p. 2.

[26] Jeff Cormell Email, Dkt. No. 39-15, pp. 1-4.

[27] Affidavit of Joseph Persico, Dkt. No. 39-5.

building inspector the township "will never issue permits for those
properties."[28]

Then the Town issued a stop work order. And there was an apparent
refusal to issue a building permit for any repairs that may have required a
permit.

The record suggests[29] that all repairs could have been completed.
Moreover, the cost to do so was far less that even twenty percent of the value of
the Commercial Property.[30] Repairs are presumed unreasonable if the
municipality determines the cost of the repairs would exceed fifty percent of the
building's value. *See* Wis. Stat. § 66.0413(1)(c). The cost in this case was far
less.

The repairs that were in process or proposed appear to be sufficient to
address the violations or to protect the public from any issues that pose a
serious threat to public safety or welfare. No evidence suggests the reasonable
cost of repair was ever considered by the Town. This is troubling when
considering that one or more of the contractors is familiar with the issuance of
building permits, and the issues at the Commercial Property could be repaired.

---

[28] *Id.* at ¶ 9.

[29] *See* Affidavit of Scott Bjork, Dkt. No. 39-4, and Affidavit of Joseph Persico, Dkt. 39-
5, regarding estimates for completion of repairs.

[30] Dkt. No. 39-6 is a description of the listing for the Commercial Property. It contains
a price listed as $1,700,000.00. Even using the value in the schedules of $750,000.00
based on a prior offer to purchase, it is clear the reasonable cost of repairs is far less
than 10% of the value of the Commercial Property. *See also* Dkt. No. 14, p. 3.
Additionally, the Raze Order itself concedes the Inspector "believes the building can be
made safe by reasonable repairs." Dkt. No. 12-4, p. 5.

He concluded the buildings were structurally sound and posed "no danger for occupancy or use."[31]

Although the statute relates to public health and safety, the circumstances that led to the Raze Order point to private interests. Here, the Town said the Commercial Property was not fit for human habitation based on the Debtors' failure to repair numerous Town Code violations and dangerous conditions. The Debtors dispute that the condition of the Commercial Property was a health and safety risk.

While many of the items from the initial inspection seem, at a glance, to align with the language of Section 66.0413(1)(b) in terms of their unsafe and unsanitary implications, it also appears many had been repaired, others were in process, and the remainder would have been completed on issuance of a building permit or the ground to thaw. So, but for the stop work order and refusal of the Town to issue building permits, it appears all of the items could have been corrected.

The Town cites *In re Javens*, in which the court determined that orders directing condemnation proceedings or demolition to remove unsafe structures are not subject to the automatic stay. The violations in this matter are distinguishable from *Javens*. In that case, the city's inspector found one of the houses on the debtor's properties "in a seriously deteriorated condition

---

[31] Scott Bjork letter to Judge Waterman, Dkt. No. 25, pp. 10-11 of 15.

requiring extensive building, plumbing, electrical and heating repairs."[32]

Another property suffered fire damage, which the judge personally inspected

when the matter was under advisement.[33]

Unlike the facts in *Javens*, the violations in this case, in their entirety, do

not seem to rise to the level of the severe public health and safety concerns

required to raze the Commercial Property under Section 66.0413(1)(b). The

Town's argument is also a *conclusion* rather than a statement of fact. The

argument assumes that no repairs were made. It assumes that a missing outlet

cover or fan cover, for example, poses a serious risk to the public and that

replacing such items is more than a simple home repair requiring notice that

the replacement has happened. Finally, it ignores steps taken to arrange for

various repairs and the effect a stop work order—coupled with denial of a

permit or statements indicating no permits would be granted—would have on

addressing any remaining violations.

     *a. Repairs*

The Debtors allege that most violations were either repaired or awaiting

permit authorization to be repaired. This claim conflicts with the Town's

assertion that the Debtors did nothing of note after receipt of the Raze Order

and did not make the buildings safe and sanitary. Pursuant to Section

66.0413(b), if a building can be made safe by reasonable repairs, the owner

---

[32] *See Javens v. City of Hazel Park (In re Javens),* 107 F.3d 359, 362 (6th Cir. 1997).

[33] *See id.*

may be ordered to either make the building safe and sanitary or to raze the building.

In *In re Stinson*,[34] a bankruptcy court ruled a city failed the public policy test when its actions under a Neighborhood Preservation Act promoted private interests. The Act held property owners accountable for the neglect of abandoned, vacant, or deteriorated properties to address blight and public nuisances. The debtor's position was that her real property was never blighted because both she and her family maintained the property. In 2020, she filed for bankruptcy and confirmed her Chapter 13 plan.

The city claimed that between 2016 and 2021 there was no finding that that debtor abated the public nuisance or obtained approval of a development plan to remediate the nuisance. The debtor argued there was nothing to be abated because the city boarded up and secured her property when the city declared it a public nuisance in 2016. The court found the goal of the act noble but disagreed with the city's actions against the property, noting that the city's action served a private benefit. This was evidenced by the city initiating *in rem* proceedings in 2021, appointing a receiver to take control of the property in 2023, and filing a receiver's lien against the property in 2024. The lien held first priority under the city's statutory scheme.[35]

---

[34] *In re Stinson*, No. 20-20291, 2025 Bankr. LEXIS 2535 (Bankr. W.D. Tenn. Sep. 30, 2025).

[35] *See id.*, 2025 Bankr. LEXIS 2535, at *27-28.

Here, the Town disregards the "unreasonable to repair" and "made safe by reasonable repairs" portions of Section 66.0413(1)(b). The Debtors provided affidavits from contractors showcasing their efforts to reasonably repair and maintain the Commercial Property in accordance with the statute and the Town's Orders. The letters note the following:

- Peter Grubish, a contractor, observed that the basic structure of the commercial buildings situated on the lot are sound and in good condition. He added that the commercial units could be viable with some basic repairs, code upgrades, and remodels.[36]

- Scott Bjork of Scott's HVAC and Construction explained he maintained the property for over twenty years. In his November 2024 letter, Bjork stated he was doing minor maintenance items, as requested by the Town, until there was a stop order put in place. He halted all additional work, but the issues could be easily resolved by the issuance of permits.[37] Bjork says the buildings are structurally sound and pose no danger for occupancy or use.[38] Bjork received a $5,000.00 deposit from the Debtors. Additionally, Bjork believed he did not need a permit for the required work. He says his permit application was denied.[39]

- Henry Nechville of Nechville Excavating, Inc., stated in his December 2024 letter that upon his inspection of the separate septic system at the Commercial Property, he found the system to be in working condition. Despite Nechville having reason to believe there may be some corrosion on the cast iron piping used from the holding tank to the drain field, he would have to wait until the spring of 2025 when the frost leaves the ground to inspect and, if necessary, to make repairs.[40]

---

[36] Peter Grubish letter, Dkt. No. 25, p. 9 of 15.

[37] Scott Bjork letter to Judge Waterman, Dkt. No. 25, pp. 10-11 of 15; Aff. of Scott Bjork, Dkt. No. 39-4.

[38] Scott Bjork letter to Judge Waterman, Dkt. No. 25, pp. 10-11 of 15.

[39] *See id.*

[40] Aff. of Henry Nechville, Dkt. No. 39-14.

- Joe Persico of Persico Contracting, a general contractor, stated he toured the real estate and found the property to be structurally sound without any obvious sanitation issues.[41] He maintained he could make repairs on the Commercial Property as soon as building permits were issued. He also estimated the repairs totaled $4,725. Like Bjork, Persico received a $5,000.00 deposit.[42]

Gary Sukowatey says he had completed most of the required work and many violations were brought up to code. Sukowatey hired Bjork to complete other required work. But, as noted above, a stop work order was placed on Bjork and he had to halt the work.

The Town argues its inspection report[s] stands in contrast to the statements of Sukowatey and his contractors. The timing of the Town's actual inspection report, however, significantly predates the work and repair information in the record from contractors, Sukowatey, and a handyman. There is no evidence of follow-up inspections by the Town to determine whether the violations were resolved.

The contractors do not mention any serious structural, health, or safety concerns that could not reasonably be repaired. Sukowatey claims that the Town was not responsive to follow-up inspection requests.

He alleges the Town received a May 2023 letter requesting an inspection from Bjork. The Town seemingly initiated no inspections between the October 2022 inspection and the placement of the placard on the Commercial Property in January 2024. The Town simply says the inspector returned to the

---

[41] Aff. of Joseph Persico, Dkt. No. 39-5.

[42] *Id.*

Sukowatey Property and discovered tenants were still residing there in March

2024. Since the Town often combines references to the Commercial Property

and the Residential Property, the Court cannot confirm whether this reference

is to one or both of the properties. The Town argues that the Debtors failed to

apply for any building permits or take legal action. The record is unclear if the

Debtors applied for building permits or when repairs were made. There is,

however, evidence that others may have sought and been denied permits for

the Commercial Property.

There is a Golden Group Real Estate advertisement of the Commercial

Property that adds context to the violations listed in the inspection report. The

advertisement says the Commercial Property has three fully renovated 2-

bedroom apartments with separate a/c and utilities as well as new electric and

mechanics.[43] The renovations were alleged to be completed three years ago,

whereas the inspection report mentions multiple bedrooms with no windows or

windows that do not open. Grubish noted that the commercial building(s) could

be "viable commercial units with some basic repairs, code upgrades, and

remodels."[44]

The number of tenants at the Commercial Property is unclear. The

Debtors assert that if the building were truly unfit for human habitation, it is

---

[43] Golden Group Real Estate Advertisement, Dkt. No. 39-6.

[44] Peter Grubish letter, Dkt. No. 25, p. 9 of 15.

implausible that multiple tenants would have lived there without complaints, illness, or voluntary departures.

It seems the occupants of the Commercial Property consist of contractor workers, a commercial mechanical repair operation, and a church.[45] In an August 2025 affidavit, Elvin Rosario, a tenant and owner of MEPE Family Auto Repair Inc., claimed the property was in good working condition and the Debtors made repairs upon request. Rosario acknowledges that he knew the building was not in code compliance, which may suggest the presence of some disrepair and provides some support for the existence of some concerns.[46] The needed repairs, however, were not specified.

Still, the violations, either in their entirety, severity or cessation, do not present the Commercial Property unfit for human habitation.

### b. Permits

The Town denied the permit applications for the Commercial Property. The Debtors argue that their contractors were "unnecessarily denied" permits by the Town. The Town maintains that the Debtors failed to apply for any building permits.

In an email from April 2024, the Town communicated to the Debtors that "[n]o building permits will be approved unless the Circuit Court lifts the raze order."[47] Bjork says that a permit application from Fortress Construction was

---

[45] *See* Golden Group Real Estate Advertisement, Dkt. No. 39-6.

[46] *See* Aff. of Elvin Rosario, Dkt. No. 39-2.

[47] Jeff Cormell Email, Dkt. No. 39-15, p. 2.

denied.[48] On or about December 11, 2024, Persico requested building permits from the Town. He claims that the Town's building inspector told him the township wanted the building demolished. And he states that the inspector said the township will never issue permits for the properties.[49]

Rosario claims he was told the same sentiment by Geno Hanson, a representative of the Town. Rosario made an offer to purchase the Commercial Property. At the same time, his offer was contingent on receipt of a certified letter from the Town that guaranteed the issuance of the required permits to make the repairs to bring the building into code compliance. Rosario alleged that Hanson said the Town would not issue permits.[50] Akin to the city in *Stinson*, the Town seemingly erected a procedural roadblock that prevented the Debtors' quest for permit authorization and subsequent repair of the remaining violations.

The Town's continued insistence on razing the property after most violations had been allegedly resolved or could be resolved with permits casts doubt on its asserted public policy purpose. The Town's argument that it acted on its police and regulatory power cannot be sustained based on the facts in the record. Thus, the Town fails the public policy test.

---

[48] Scott Bjork letter to Judge Waterman, Dkt. No. 25, p. 10 of 15.

[49] Aff. of Joseph Persico, Dkt. No. 39-5.

[50] Aff. of Elvin Rosario, Dkt. No. 39-2.

2. *Pecuniary Purpose Test*

The analysis turns to the pecuniary purpose test. The test considers whether the government chiefly seeks to protect a pecuniary governmental interest in the debtor's property rather than protecting the public safety and health.

In *In re Commonwealth*, the court classified an action to protect a pecuniary interest in the estate or property of the debtor as "one which directly conflicts with the bankruptcy court's control of [the] property."[51] The court notes the clearest example is an "action resulting in a pecuniary advantage over other creditors."[52]

Additional examples include an action to collect taxes or an action on a debt arising from a normal commercial transaction to purchase services and goods. These are usually stayed by the automatic stay. But when money damages are ancillary to a governmental unit's enforcement of its police and regulatory power, the action is *not* stayed.[53] According to the Fifth Circuit, the seizure of a debtor's property to satisfy a judgment obtained by a creditor is prohibited by subsection 362(b)(5).[54]

In *In re Phillips*, the court found that the main purpose of a city's law enforcement was not pecuniary in nature because the ordinance violation was

---

[51] *See In re Commonwealth Cos.*, 913 F.2d 518, 524 (8th Cir. 1990).

[52] *See id.*

[53] *See Diaz v. Tex. (In re Gandy)*, 327 B.R. 796, 804 (Bankr. S.D. Tex. 2005).

[54] *See Commonwealth Oil Ref. Co.*, 805 F.2d at 1186.

to remove materials detrimental to public health. The city monitored, maintained, and cleaned the debtor's property and was not paid for the work it performed.[55] The materials removed were trash, garbage, rubbish, waste, wastewater, appliances, and furniture in the yard. The city's inspector noted "extremely unsanitary conditions in the yard at the [property]," including garbage and discarded diapers.[56] And there was trash in a house that was occupied without utility service.[57] The *Phillips* court determined that the fines issued were not money judgments but the reimbursement costs for the city's safety repairs (e.g., boarding up a window and door) and the clean-up work (e.g., clearing garbage). Thus, the court determined the actions were within the city's police and regulatory powers under section 362(b)(4), thereby excepting the action from the stay.[58]

Here, the Town argues that the Raze Order provides for the specified relief of the removal of the Commercial Property because it has been determined to pose a risk of harm to the public. The Debtors maintain that the Town's conduct demonstrates financial motives inconsistent with true regulatory enforcement. This conduct includes refusing to reinspect repaired properties, excessive fines, and leveraging demolition threats to compel

---

[55] *See Phillips v. City of S. Bend (In re Phillips)*, 368 B.R. 733, 736 (Bankr. N.D. Ind. 2007).

[56] *See id.* at 736.

[57] *See id.*

[58] *See* id. at 741.

payment. The Town asserts that the violations are distinct and separate from the Raze Order.

A portion of the Town's argument is correct. The citations are ancillary to the Raze Order. The Debtors reference the Town's January 2025 letter[59] which offered to allow them to retain the commercial building if the following relevant terms were met:

1. Raze and remove the buildings and structures located at 903 120th Street, Roberts, WI 54023 (the "Residential Property");

2. Remove all junked vehicles, junk, debris, and other public nuisances, as defined in Title 11, Chapter 6, of the Town's Code of Ordinances, in existence at the Properties;

3. Raze and remove the garage located on the Commercial Property; and

4. Repair the main building on the Commercial Property to correct all of the Town Code violations to make the property habitable. This would include applying for the proper permits from the Town for such work, strictly following the requirements of such permits in the completion of the required work, and completing the required work by April 15, 2025.

You also must <u>immediately</u> remove all tenants from the Properties in accordance with the Court's order. However, if you agree to meet all the requirements above, and actually meet the requirements within the deadline, the Town will allow the commercial tenant to remain in the 905 120th St. property.

The conditions don't demand any specific pecuniary or monetary benefit as Debtors argue. More to the point, however, the conditions contradict the position of the Town that the Commercial Property is dangerous, unsafe, or unsanitary and cannot reasonably be repaired.

---

[59] Town Offer, Dkt. No. 39-9, pp. 1-2.

Despite the Debtors' mischaracterization of the letter, the terms confirm that if the Residential Property was razed and repairs were made to the Commercial Property (assuming the Town would issue permits), then the commercial tenants could remain. But the Town's offer did not stop there—it moved the goalpost for what the Debtors must do to keep the structures on the Commercial Property. Terms 2 and 3 are not listed in the 2022 inspection report. In exchange for the Debtors' completion of the new set of terms, the Town would not raze the Commercial Property. Still, this conflicts with the refusal to issue building permits.

Further, the substantial citations may suggest a pecuniary purpose other than protecting public safety and welfare. The citations total $132,130.00. The costs for some violations are:

| 1061 | No Cover on Bathroom Fan | $3,167.50 | 23FO259 |
|---|---|---|---|
| 1062 | Mold/Water Damage in Bathroom | $3,167.50 | 23FO260 |
| 1073 | Plumbing Pipes Not Properly Supported | $3,167.50 | 23FO279 |
| 1074 | Plumbing Pipe Discharges Outside of Building | $3,167.50 | 23FO280 |
| 1075 | Sliding Door Not in Working Order | $3,167.50 | 23FO281 |
| 1076 | Multiple Electrical Outlets Exposed - Exterior | $3,167.50 | 23FO283 |
| 1077 | Building is Missing Siding on Exterior | $3,167.50 | 23FO285 |
| 1078 | Paint Cans/Chemicals Stored in Back Room | $3,167.50 | 23FO286 |

It is understandable that a plumbing pipe discharge may give rise to a higher violation amount. It is unclear, however, why paint cans and chemicals stored in the back room as well as no cover on a bathroom fan would amount to $3,167.50 each. As noted by Mr. Sukowatey,[60] painting was being done so the presence of paint cans could be expected as normal.

It seems the citations may be some per diem amount calculated from the date of the initial inspection. Yet if many items had been repaired, how the amounts were determined is unclear. And unlike *Phillips*, the Town did not monitor, maintain, or clean the Commercial Property.

The violations mentioned in *Phillips* are distinguishable from the citations listed above (e.g., discarded dirty diapers, trash in the house, wastewater, etc.) in terms of their severity and duration. In *Phillips*, the inspector documented "extremely unsanitary conditions."[61] Discarded diapers and garbage were noted in the yard at the property.[62] When the owners in *Phillips* failed to take action, the city did.

The city in *Phillips* monitored, cleaned, and maintained the debtor's property for at least 13 months.[63] The city's control of the property started in

---

[60] Aff. of Gary Sukowatey, Dkt. No. 39-4, ¶ 3.

[61] *See Phillips*, 368 B.R. at 736.

[62] *See id.*

[63] In *Phillips,* the city filed a motion for summary judgment on September 1, 2006. A memorandum in support of the motion relied on an affidavit of the director of the department of code enforcement. The director asserted that the city monitored, cleaned, and maintained the debtor's property since August 2005. The city continued to monitor and maintain the property after the debtor recorded a quitclaim deed to transfer the property in May 2006. *See Phillips*, 368 B.R. at 736.

August 2005.[64] In April 2006, the city issued an order to comply and directed the debtor to make the listed repairs to the property. Additionally, notices of a potential $5,000 civil penalty under the city's unsafe building act were issued.[65] The debtor failed to improve the conditions at the property even after the city notified the debtor to abate the violations or be subject to additional legal action.[66] Ordinance violations, with fines, were issued against the debtor starting in August 2005.[67]

Here, violations such as the sliding door not working and mold or water damage in the bathroom do not parallel the "extremely unsanitary conditions" asserted in *Phillips*. The plumbing pipe discharge may be comparable. However, it is unclear if the discharge presumably consisted of human waste like the discarded diapers in *Phillips*.

The Town did not monitor the Commercial Property as was the case in *Phillips*. The record does not indicate the Town conducted a follow-up inspection to determine whether the Debtors resolved the issues at the Commercial Property. A letter of non-compliance is dated December 20, 2022. The Debtors were given 30 days to address the issues cited in the letter. The Town waited ten months to serve the Raze Order in October 2023. In January 2024, the inspector posted a placard that the buildings were not fit for human

---

[64] *See Phillips*, 368 B.R. at 736.

[65] *See id.* at 735.

[66] *See id.* at 736.

[67] *See id.* at 735 n.2

habitation. In March 2024, the inspector returned to the Sukowatey Property and discovered tenants were still residing there.[68]

The Town's statements suggest the inspector did not inspect for *repairs* at the Commercial Property. Rather, the inspector inspected for *tenants*. It is also unclear, other than the commercial tenant, whether the tenants referred to were at the Commercial Property or the Residential Property.

The Town did not monitor the Commercial Property before issuing the citations against the Debtors. And in contrast to the Debtors in this case, the debtor in *Phillips* did not improve the conditions on her property.[69] Here, it appears the Debtors resolved most of the violations. Given the lack of a follow-up inspection, lack of investigation of the alleged repairs, and consideration for the type and severity of certain violations, the magnitude of the fines suggests a pecuniary interest is, in part, at issue here.

The facts suggest the Town was motivated to protect a pecuniary interest in the Debtors' property, which it achieved by either ignoring or exaggerating the property's condition. The Raze Order directly conflicts with this Court's control of the Commercial Property.  The Town may secure a pecuniary advantage over other creditors by imposing substantial citations for resolved violations or those repairs that could have been made but for the stop work

---

[68] This reference could apply to either of or both the Commercial and Residential Properties.

[69] *See id.* at 736.

order and the denial of permits. Hence, the Town fails the pecuniary purpose test.

> 3. *Final Inquiry*

This Court's final inquiry is whether the specific proceedings are *designed* to protect public safety and welfare *or* represent a governmental attempt to recover from property of the estate.

The record before the Court does not support the conclusion the Raze Order is designed to protect public safety and welfare. The Debtors have addressed most of the issues. It seems the potential threat to public safety and welfare has been addressed or, with the issuance of requested permits, would have been resolved. They hired several contractors to repair the violations.

The Town has not shown evidence of the current state of the items listed in the inspection report. And so, the substantial citations for resolved violations suggest a governmental attempt to recover from property of the estate. This would significantly improve the advantage of the Town over other creditors. Thus, the record does not support a conclusion the specific proceedings are designed to protect public safety and welfare.

## CONCLUSION

For these reasons, the Town has failed, so far, to establish the Raze Order with respect to the Commercial Property is a valid exercise of the Town's police and regulatory power under section 362(b)(4). So the Raze Order should be stayed under section 362(a). The Town's *Motion for Determination of Inapplicability of the Automatic Stay or, in the Alternative, for Relief from*

*Automatic Stay*, is DENIED. Further, with regard to the request for relief from the automatic stay, there are material facts in dispute. Further evidentiary proceedings are required to determine whether to grant relief from stay.

This decision constitutes findings of fact and conclusions of law under Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated: November 21, 2025

BY THE COURT:

_____
Hon. Catherine J. Furay
U.S. Bankruptcy Judge